UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD TUCKER RIOS,<br><br>  Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL,[1]<br><br>  Defendant. | Case No. 14-cv-00654-JCS<br><br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 28, 32 |

## I.    INTRODUCTION

Plaintiff Richard T. Rios, pro se, moves for summary judgment seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for Title II disability insurance benefits as well as under Title XVI for supplemental security income.  Rios argues that the administrative law judge ("ALJ") who denied his application for benefits committed a reversible error for failing to consider "very important evidence" concerning his disabilities in her unfavorable opinion dated July 31, 2015.  Pl.'s Mot. (dkt. 28) at 3.  The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons stated below, Rios's motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for further administrative proceedings in accordance with this opinion.[2]

## II.    BACKGROUND

### A.    Procedural History

Rios first applied for benefits under Title II and Title XVI in 1995 for alleged disability

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted as Defendant in this action.  See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

1  beginning on October 16, 1993. Rios's claims were initially denied on January 19, 1996 because

2  "it was determined that [Rios] had the capacity to engage in substantial gainful activity."

3  Administrative Record ("AR") (dkt. 25) at 39 (ALJ's 2012 decision summarizing the procedural

4  history of Rios's application). Rios did not request reconsideration. *Id.*

5       Rios protectively filed a Title XVI application for supplemental security income on April

6  6, 2010 and a Title II application disability insurance benefits on April 26, 2010. *Id.* Rios alleged

7  disability beginning December 17, 2009 on both applications. *Id.* The Social Security

8  Administration first denied those claims on September 29, 2010 and again on upon

9  reconsideration on August 8, 2011. *Id.* Rios filed a written request for a hearing before an ALJ,

10  and a hearing was held on September 8, 2011. *Id.* Rios appeared without representation and

11  testified at the hearing before ALJ Maxine R. Benmour ("ALJ Benmour"). *Id.* Impartial

12  vocational expert Joel M. Greenberg, M.S., ("VE Greenberg") also appeared at the hearing. *Id.*

13  On August 2, 2012, ALJ Benmour issued an unfavorable decision, finding that Rios was not

14  disabled under § 1614(a)(3)(A) of the Social Security Act. *Id.* at 47.

15       Rios requested review of ALJ Benmour's decision, which the Social Security

16  Administration Appeals Council denied on December 13, 2013, finding "no reason under [its]

17  rules to review [ALJ Benmour's] decision." *Id.* at 117. Rios filed a complaint on February 10,

18  2014, seeking judicial review by this Court. Complaint (dkt. 1) at 2. On June 16, 2014, The

19  Commissioner filed an ex parte motion for remand pursuant to sentence six of 42 U.S.C. § 405(g)

20  "because significant portions of the hearing held on July 25, 2012 are inaudible." Def.'s Mot. to

21  Remand (dkt. 11) at 2. The Court granted the Commissioner's motion on June 19, 2014. Order

22  on Ex Parte Mot. for Sentence Six Remand (dkt. 13) at 2.

23       On remand, the Social Security Administration Appeals Council instructed the ALJ to

24  associate duplicative claims Rios had since filed with Rios's claims that the Court had remanded.

25  AR at 7 (ALJ's 2015 decision summarizing the procedural history of Rios's application). The

26  Social Security Appeals Council vacated the Commissioner's final decision and remanded the case

27  to an ALJ for: (1) a new hearing; (2) "any further action needed to complete the record"; and (3) a

28  new decision. *Id.* The new hearing took place on April 23, 2015 before ALJ Benmour.

Vocational Expert Laurence Hughes ("VE Hughes") also appeared at the hearing. *Id.* ALJ Benmour issued another unfavorable decision on July 31, 2015, finding that Rios is not disabled under § 1614(a)(3)(A) of the Social Security Act. *Id.* at 16. ALJ Benmour's second unfavorable decision "became the final decision of the Commissioner of Social Security absent further jurisdictional actions." Def.'s Mot. (dkt. 31) at 2.

### B. Rios's Background

#### 1. Employment History

Rios was born on January 3, 1962. AR at 322. According to his Work History Report, Rios worked as a garlic packer in 1995. *Id.* at 395. He worked as a calf raiser from 1999 to 2002. As a calf raiser, Rios looked after newborn calves, administered medication, and lifted newborn calves and bales of hay. *Id.* at 394, 636. In 2003, Rios worked for a phone card vendor. He "serviced and stocked phone card machines." *Id.* at 389. In 2004, Rios worked as a fruit packer, sorting kiwis and stacking them in boxes. *Id.* at 393. From 2005 to 2009, he worked as a health care provider, providing in home health care services. *Id.* at 398. Rios also worked as a groundsman for a tree trimming service between 2006 and 2007. *Id.* As a groundsman, Rios hauled tree cuttings to be chipped, raked and cleared debris, and used pruners to protect houses from falling debris while his colleagues trimmed trees. *Id.* at 390.

#### 2. Medical History

##### a. Injuries

Rios injured his right hand on October 16, 1993. *Id.* at 636. Rios was working as a feeder at a dairy farm when his right hand "was caught in a[n] [a]lfalfa chopper." AR 448. On September 28, 2006, Rios sustained injuries to his face and neck while working as a groundsman for a tree trimming service when a colleague trimmed and dropped a tree branch from approximately eighty feet in the air. *Id.* at 400. On April 10, 2007, Rios hurt his left shoulder and elbow while he was "pulling some brush" in the course of his work as a groundsman for a tree trimming service. *Id.* at 609. His left shoulder "came out of joint." *Id.*

##### b. Donald L. Hager, M.D.

Donald L. Hager, M.D., examined Rios as a Qualified Medical Examiner following his

3

right hand injury in October of 1993. In his evaluation report dated August 26, 1996, Dr. Hager

wrote that Rios "caught his hand in the outer prong of the chopper machine" and that Rios

underwent surgery and physical therapy before returning to work at a different dairy farm on

January 3, 1994. *Id* at. 599. Dr. Hager wrote that Rios "ha[d] fairly extensive complaints"

stemming from the injury, including "constant pain in his right hand and [an] inability to do many

things with his right hand," such as writing, grasping, and making a first. *Id*. According to Dr.

Hager, Rios "state[d] he [was] unable to do the work of a feeder on a dairy [farm] because he

needs both hands and because of limitations of use of his right hand." *Id*. Based on a review of

Rios's medical records as well as a physical examination, Dr. Hager found that Rios sustained an

"extensive laceration on the dorsum of his right hand with involvement of the extensor tendons

and the extensor hood mechanism of the index finger." *Id*. at 603. Dr. Hager also found that

Rios's disability of his right hand "precludes repetitive gripping, pushing, pulling, and twisting,

and sustained forceful grasping." *Id*. at 643.[3] In terms of vocational rehabilitation, Dr. Hager

concluded that Rios was a "medically Qualified Injured Worker" and that he "accepted" Rios's

statement that he was unable to continue working as a feeder at a dairy farm. *Id*. at 604. Dr.

Hager classified Rios's right hand disability as being "permanent and stationary." *Id*. at 643.

c.     S.S. Shantharam, M.D.

S.S. Shantharam, M.D., conducted an orthopedic consultation on August 6, 2007

pertaining to Rios's left shoulder and elbow injuries. *Id*. at 631. Dr. Shantharam wrote that Rios

"sustained an injury to the left part of his upper body involving his left shoulder and left elbow on

April 10, 2007." *Id*. Based on a physical examination of Rios as well as x-rays of Rios's

shoulder, Dr. Shantharam concluded that "Mr. Rios has impingement disease possibly rotator cuff

tear" and that Rios also "has tennis elbow on the left side possibly lateral epicondylitis." *Id*. at

633. Dr. Shantharam recommended that Rios get an MRI "to rule out a rotator cuff injury" and

allowed Rios to "return to work with modifications including restricted activities as far as the left

upper extremity is concerned." *Id*.

---

[3] The eighth and ninth pages of Dr. Hager's report are located approximately forty pages apart from the rest of his report in the administrative record.

d.      Geoffrey Miller, M.D., F.A.C.S., F.I.C.S

Geoffrey Miller, M.D., F.A.C.S., F.I.C.S, performed a comprehensive re-evaluation on November 20, 2010. *Id.* at 608. In his report, Dr. Miller noted that he had previously examined Rios on April 16, 2009, but his findings from that visit are not a part of the record. [4] Dr. Miller noted that his physical examination of Rios "did not show any specific objectives in the neck or the left shoulder," which "was consistent with the records of Dr. [Shantharam] as well as [Dr.] Touton." *Id.* at 610. Dr. Miller also noted that "[t]here were MRI scans which did show degenerative changes and electrodiagnostics which did suggest carpal tunnel, but nothing from the neck, and there were no carpal tunnel symptoms." *Id.* He "agreed with both [Dr. Shantharam and Dr. Touton] that [Rios] did have ongoing symptoms but that the objective evidence was lacking and there might be some underlying neurologic disorder" because Rios experienced "blackouts or what [Rios] describes . . . as more like a visual change which comes and goes." *Id.* Dr. Miller ultimately "concluded a non-verified radiculopathy would make sense" and "agreed with Dr. Touton's rating." *Id.*

e.      Charles H. Touton, M.D.

Rios also saw Charles H. Touton, M.D., on numerous occasions following his first visit on June 13, 2008. *See id.* at 508–10, 527–33, 620–21. It also appears from the record that Dr. Touton ordered an MRI of Rios's cervical spine in July of 2008, as his name is listed on the imaging report. *Id.* at 506. The MRI, performed by H. Tookoian, M.D., indicated "[d]egenerative changes . . . including uncovertebral hypertrophy" as well as a "prominent posterior disc bulge at the C6-7 level." *Id.* 507.

In a report dated February 2, 2009, Dr. Touton wrote that "we have evidence of a cervical injury with radiculitis, but no defined active radiculopathy." *Id.* 621. Dr. Touton also noted that Rios's symptoms were "being managed on medications to include ibuprofen and

---

[4] The version of Dr. Miller's report in the record appears to be incomplete. *See* AR 608. The document's own Table of Contents states that the document is at least six pages, but the version in the administrative record is only three pages. The pages in the administrative record discuss Rios's interim history and Dr. Miller's review of his medical file, but subsequent pages concerning Rios's present status, Dr. Miller's physical examination of Rios, as well as Dr. Miller's comment and overall opinion are missing from the record.

hydrocodone/acetaminophen," with Rios being "limited to 40 hydrocodone (7.5 mg) per month, and ibuprofen 600 mg, up to 100 per month." *Id.* Lastly, Dr. Touton wrote that Rios "has not been able to work as a tree service person, nor is it expected that he can do so in the future." *Id.*

In a report from a follow up visit dated June 9, 2009, Dr. Touton wrote that there was "very little change" in Rios's condition. *Id.* 510. Dr. Touton and Rios discussed "what work activities he may wish to go into," and Rios expressed interest in truck driving. *Id.* Dr. Touton informed Rios that pursuing a career in truck driving would be suitable "as long as [Rios] did not have to do significant loading/unloading." *Id.* Dr. Touton also noted that he and Rios "discussed the importance of his 'moving on in life' and getting into gainful employment." *Id.* In a follow up report dated September 2, 2009, Dr. Touton noted that Rios's "overall condition has changed very little." *Id.* at 509, 527 (duplicate). Dr. Touton advised Rios that "it would be best if [Rios] were off Vicodin when he goes into driving trucks" but noted Rios was currently "authorized up to 40 Vicodin ES per month and up to 100 ibuprofen 600 mg per month, with recommendation to take the minimum tablets." *Id.* In a follow up report dated February 8, 2010, Dr. Touton noted that he "s[aw] no evidence of radiculitis or radiculopathy and there is certainly no sign of cervical instability," although there was "clearly some stiffness." *Id.* 508, 528 (duplicate). Rios "report[ed] increasing symptoms in [his] neck, with stiffness and some symptoms of discomfort extending into both upper extremities." *Id.* at 528. Based on x-rays and a physical examination, Dr. Touton concluded that Rios had "[c]ervical disc syndrome, C6-7, with some increased symptoms, but little objective change." *Id.* Dr. Touton continued to prescribe Rios forty Vicodin ES per month as well as ibuprofen 600 "with the expectation that he would take two to three per day." *Id.* at 529.

Dr. Touton also conducted an orthopedic examination of Rios on July 9, 2010, after Rios expressed his dissatisfaction with Dr. Miller's report from November 2009 described above. *Id.* at 530. Dr. Touton noted that "[a]pparently the workers' compensation judge has suggested that [Rios] return to [Dr. Touton's] office so that [he] could comment on [Dr. Miller's] QME evaluation." *Id.* In his commentary, Dr. Touton explained that he was previously unaware of Rios's 2006 injury when Rios was hit in the face with a tree branch and that he did not "recall that

[Rios] ever reported" the injury to him. *Id.* at 532. Dr. Miller's report indicated, however, that he "felt that Dr. Touton's [earlier] rating [was] appropriate." *Id.* Concerning Dr. Miller's approval of Dr. Touton's prior rating, Dr. Touton found that his own rating was a "somewhat 'generous' evaluation based on some of the uncertainties present." *Id.* Dr. Touton's sole concern with Dr. Miller's evaluation was that Dr. Miller "felt that a continued medical award [was] not required." *Id.* at 533. Dr. Touton disagreed, finding that "some ongoing use of analgesic medication would seem justified" in light of Rios's rating impairment issues. *Id.* Dr. Touton found that long-term use of narcotics was inappropriate due to Rios's lack of "defined radiculitis / radiculopathy," but he ultimately concluded that Rios should receive a "continued medical award" for non-narcotic pain medication. *Id.*

### f.    Dale H. Van Kirk, M.D.

Dale H. Van Kirk, M.D., performed a comprehensive orthopedic evaluation on June 19, 2011. *Id.* at 557. Dr. Van Kirk diagnosed Rios as having: (1) "[c]hronic cervical musculoligamentous strain/sprain, likely associated with degenerative disk disease;" (2) "[c]hronic lumbosacral musculoligamentous strain/sprain, likely associated with degenerative disk disease;" and (3) "[r]otator cuff tendonitis of the left shoulder." *Id.* at 560. In his functional assessment, Dr. Van Kirk found that Rios should be able to walk or stand for four hours in an eight-hour work day and that Rios "should be able to sit down and rest periodically for a brief period of time should he develop progressive pain in the lower back, neck or left shoulder." *Id.* Dr. Van Kirk also concluded that Rios should be able to sit for six hours within an eight-hour work day. *Id.* Dr. Van Kirk recommended that Rios "should be able to lift and carry frequently 10 pounds and occasionally 20 pounds, limited because of chronic neck pain, lower back pain and left shoulder" and that Rios should perform any lifting primarily with his right upper extremity. *Id.* at 561. Dr. Van Kirk limited the scope of his physical activities "because of significant neck pain as well as lower back pain and left shoulder pain." *Id.* Dr. Van Kirk limited Rios from "work[ing] repetitively with his left upper extremity over his head . . . because of chronic pain in his left shoulder and rotator cuff tendonitis." *Id.* Lastly, in terms of environmental limitations, Dr. Van Kirk concluded that Rios "should not be required to work in a cold and/or damp environment. *Id.*

7

g.      Soheila Benrazavi, M.D.

Soheila Benrazavi, M.D., conducted a complete orthopedic evaluation on March 28, 2014. *Id.* at 649. Dr. Benrazavi first noted that it appeared as though Rios had recovered from any left foot drop conditions that Rios may have had. *Id.* at 652. Concerning his cervical spine, Dr. Benrazavi noted that Rios had diminished range of motion and that "he was noted to keep his neck somewhat stiff," but Rios's "cooperation with the examination was somewhat moderate and not full." *Id.* Dr. Benrazavi also noted that there was "no evidence of cervical radiculopathy," although Rios did have some diminution in power, which Dr. Benrazavi attributed to Rios's left shoulder injury. *Id.* With respect to his lumbar spine, Dr. Benrazavi found that Rios had a diminution in range of motion but that there was no evidence of lumbar radiculopathy. *Id.* Concerning his left shoulder, Dr. Benrazavi found that Rios "appear[ed] to have a degree of tendinitis," and that Rios's diminished range of motion "may suggest a rotator cuff syndrome." *Id.* Dr. Benrazavi ultimately found, however, that it was difficult to provide definitive assessment because Rios's "cooperation was not full." *Id.*

Dr. Benrazavi's functional assessment contained numerous limitations, some of which differed from the limitations that Dr. Van Kirk proposed. Regarding Rios's ability to lift and carry objects, Dr. Benrazavi found Rios "able to lift and carry 20 pounds occasionally, and 10 pounds frequently." *Id.* at 653. In terms of sitting and standing, Dr. Benrazavi concluded that Rios could "stand and walk up to six hours per eight-hour work day, and sit for six hours out of an eight-hour workday due to an impression of cervical degenerative disc disease." *Id.* Additionally, Dr. Benrazavi limited activities involving "frequent turning of the neck or holding the neck in prolonged flexed or extended positions" and "[w]orking above the head" to an occasional basis. *Id.* Lastly, Dr. Benrazavi limited "[w]orking above the head . . . to occasional with the left upper extremity." *Id.*

**C.    Legal Background**

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 432(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996).

The Commissioner uses a "five-step sequential evaluation process" to determine if a claimant is disabled. 20 C.F.R.§ 404.1520(a)(4). At Step One, the ALJ must determine if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If so, the ALJ determines that the claimant is not disabled and the evaluation process stops. If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to Step Two.

At Step Two, the ALJ must determine if the claimant has a "severe" medically determinable impairment. An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled. If the claimant does not have a severe impairment, the ALJ proceeds to Step Three.

At Step Three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "listing"). *See* Appendix 1, Subpart 1 of 20 C.F.R. Part 404. If the claimant's impairment is included in the listing, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to Step Four.

At Step Four, the ALJ must assess the claimant's Residual Function Capacity ("RFC"). An RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4). Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough

1  for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1).  If the claimant is able to

2  perform his past relevant work, then the ALJ finds that he is not disabled.  If the claimant is unable

3  to perform his past relevant work, then the ALJ proceeds to Step Five.

4      At Step Five, the burden shifts from the claimant to the Commissioner.  *Bray v. Comm'r of*

5  *Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).  The Commissioner has the burden to

6  "identify specific jobs existing in substantial numbers in the national economy that the claimant

7  can perform despite his identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir.

8  1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1999)).  If the Commissioner is

9  able to identify such work, then the claimant is not disabled.  If the Commissioner is unable to do

10  so, then the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).

11  **D.    Hearing on July 25, 2012[5]**

12      ALJ Benmour began her examination of Rios with questions regarding his medical

13  records.  AR at 234.  Rios had no objection regarding the medical records that ALJ Benmour had,

14  and ALJ Benmour admitted them into the record.  *Id.* at 235.  ALJ Benmour then questioned Rios

15  about his education, and Rios responded that he had finished the eleventh grade but had not

16  acquired a General Equivalency Diploma.  *Id.* at 238.  Regarding his work history, Rios stated that

17  he had previously worked as a groundsman for a tree trimming service, a homecare provider, a

18  phone card vendor, and a calf raiser.  *Id.* at 238–39.  Rios stated that he stopped working in 2007

19  due to a neck injury after having been hit in the face, although he continued to work for eight more

20  months following his neck injury.  *Id.* at 241.  When asked whether he stopped working due to his

21  neck or his elbow injuries, Rios answered that he stopped working because of his neck injury.  *Id.*

22  at 241.

23      ALJ Benmour then questioned Rios about the medical care he has received for his injuries.

24  Rios responded that he went to see Dr. Touton, who informed him that "there's nothing we can do

25  for your neck because your neck, your discs, your multiple levels of your discs are all deteriorating

26

27  _____

[5] As mentioned above, the transcript of this hearing contains numerous inaudible portions.
28  Accordingly, this section is likely not a complete restatement of the hearing, rather, it merely
reflects what is in the transcript.

United States District Court
Northern District of California

and they're pushing against all your nerves . . . and spinal cord." *Id.* at 254. Rios stated that Dr. Touton also informed him that "there's doctors out there that will do it for the money," although it would make his condition worse. *Id.* at 244–45. ALJ Benmour questioned Rios about his condition and what medications he takes for the pain. *Id.* at 243, 245. Rios responded that his neck injury feels worse than it did in 2007 and that he takes ibuprofen for the pain. *Id.* at 243, 245. Rios also indicated that he previously took Vicodin but no longer has a prescription for the medication. *Id.* at 245. ALJ Benmour also questioned Rios regarding whether he did anything else to manage his pain such as massage therapy or taking hot showers. *Id.* Rios indicated that he tried to take hot showers but found it difficult to stand up or "move around without hurting." *Id.* at 246. ALJ Benmour inquired about the discussions Rios had with Dr. Touton regarding receiving training to become a truck driver, and Rios replied that his condition has worsened since then. *Id.* at 249.

ALJ Benmour also questioned Rios about his ability to complete basic, daily tasks. *Id.* at 246–51. Rios replied that he spent most of the day lying down and that his fiancée, who lives with him, takes care of him by helping him bathe, washing his hair, tying his shoes, and cooking for him. *Id.* at 246–47. ALJ Benmour asked Rios whether he had difficulty sitting for long periods of time, and Rios answered that he could not sit for more than five minutes before needing to stand. *Id.* at 247. With respect to his ability to walk long distances, Rios stated that he could walk "maybe 20 to 25 feet, real slow." *Id.* When ALJ Benmour asked Rios how he traveled to the hearing, Rios replied that he drove, that he has a car, and that he normally only drives about 1.5 miles from his home to a pharmacy. *Id.* at 248. Next, ALJ Benmour questioned Rios regarding how many pounds Rios thought he could lift. Rios replied that he thought he could lift about five pounds and that he has problems with his left elbow and shoulder as well as arthritis in both shoulders. Rios stated that he could not lift his hands above his head or tie his shoes. *Id.*

ALJ Benmour then asked Rios to describe what a typical day is like for him. Rios replied that he tries to get up "as early as possible," his fiancée helps him shower, feeds him, and then he tries to watch some television or walk around until he needs to rest because "a lot of pressure [goes] up into [his] head." *Id.* at 250–51. Rios explained that after rest, he was able to "get back

11

up" until "it starts all over again." *Id.* at 251. Rios also indicated that he has trouble sleeping at night and that he needs to sleep on a flat surface. *Id.* at 249. In terms of other symptoms, Rios stated that he experiences "a tingling numbness all through [his] body" since sustaining his neck injury. *Id.* at 249.

Next, ALJ Benmour questioned VE Greenberg, presenting different hypothetical scenarios. First, ALJ Benmour asked VE Greenberg whether an individual with the same age, education, and work background as Rios could perform his past work if said individual had the following limitations:

> [L]ifting and carrying 20 pounds occasionally and 10 frequently; sitting six hours in an eight-hour day; standing, walking four; needs to sit and rest periodically for a brief period; occasional climbing, balancing and stooping, kneeling, crouching and crawling; occasional overhead reaching with the left, non-dominant left upper extremity; must avoid concentrated exposure to extreme cold and wetness and humidity and hazards.

*Id.* at 254. VE Greenberg responded in the negative. *Id.* Given the same limitations, ALJ Benmour asked VE Greenberg whether there were "other jobs in the regional or national economy economy that such a person could do." *Id.* at 254–55. VE Greenberg replied that there were other jobs that the individual could perform. *Id.* at 255. ALJ Benmour then asked Rios whether he had any questions for VE Greenberg, and Rios responded in the negative. *Id.* at 256.

### E. Unfavorable Decision Dated August 2, 2012

#### 1. Step One: Substantial Gainful Activity

ALJ Benmour began her analysis by noting that Rios met the insured status requirements of the Social Security Act through December 31, 2014. *Id.* at 106. Next, ALJ Benmour found that Rios has not engaged in substantial gainful employment since December 17, 2009. ALJ Benmour reasoned that although Rios worked after the alleged disability onset date, "this work activity did not rise to the level of substantial gainful activity." *Id.*

#### 2. Step Two: Severe Impairments

ALJ Benmour determined that Rios "has the following severe impairments: degenerative disc disease of the cervical spine, rotator cuff tendonitis of the left shoulder, and obesity." *Id.* at

12

107.  ALJ Benmour found that "[t]he above impairments more than minimally affect the [Rios's] ability to perform basic work functions."  *Id.*

### 3. Step Three: Medical Severity

ALJ Benmour determined that Rios did not "have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."  *Id.*  With respect to obesity, ALJ Benmour noted that obesity is not a listed impairment but "considered the combined effects of [Rios's] obesity when evaluating his disability . . . by assessing the effect obesity has upon the [Rios's] ability to perform routine movement and necessary physical activity within the work environment."  *Id.*

Concerning Rios's shoulder and spinal injuries, ALJ Benmour concluded that Rios had insufficient medical evidence to meet or equal a listed impairment.  With respect to Plaintiff's shoulder injury, ALJ Benmour noted that a major dysfunction of a joint "calls for evidence of a gross anatomical deformity . . . and chronic pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and findings of appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint."  *Id.*  Regarding Rios's spinal injury, ALJ Benmour noted that "a disorder of the spine must be corroborated by medically acceptable clinical and imaging studies supporting evidence of compromise of a nerve root . . . or the spinal cord."  *Id.*

### 4. Step Four: Residual Functional Capacity

ALJ Benmour determined that Rios "has the residual functional capacity to perform light work," that he can "stand and/or walk for four hours in eight-hour day and must be able to rest periodically for brief periods," that he can "occasionally climb, balance, stoop, kneel, crouch, and crawl," and that he can "occasionally reach overhead with his upper left extremity."  *Id.* at 108.  In addition, ALJ Benmour concluded that Rios "must avoid concentrated exposure to extreme cold, wetness, humidity, and hazards."  *Id.*

In making this determination, ALJ Benmour first considered the June 2009, February 2010, and August 2011 assessments by Dr. Touton.  ALJ Benmour noted that Dr. Touton "discussed possible work activities in which [Rios] could engage during a routine appointment in

2009," including the possibility of Rios working as a truck driver. *Id.* Additionally, ALJ
Benmour noted that Dr. Touton "thought that it was important for the claimant to move on and
find gainful employment." *Id.* In terms of a diagnosis, Dr. Touton found that Rios had cervical
disc syndrome at C6-7 as well as a left shoulder sprain. *Id.* ALJ Benmour noted that in Dr.
Touton's February 2010 assessment, Dr. Touton "wrote that he saw no evidence of radiculitis or
radiculopathy, and no sign of cervical instability" and reported that electrodiagnostic studies from
September 2008 were normal, with the exception of "some slowing of the median nerve at the
wrist, which did not correlate with any of his symptoms." *Id.* at 108–09. ALJ Benmour also
considered Dr. Touton's August 2011 assessment in which Dr. Touton "found decreased range of
motion of the neck, satisfactorily functioning shoulders, and no symptoms of cervical
radiculopathy." *Id.* at 109.

Second, ALJ Benmour noted that Rios "failed to present for an appointment with a
consultative examiner in August 2010" and that "State agency medical consultant concluded that
there was insufficient evidence to establish a medically determinable impairment from the
claimant's alleged onset date." *Id.* at 109.

Third, ALJ Benmour considered the June 2011 consultative examination by Dr. Van Kirk.
ALJ Benmour attributed "great weight" to Dr. Van Kirk's opinion because "it is consistent with
the record as a whole and he gave reasonable consideration to the claimant's self-reported
limitations." *Id.* ALJ Benmour noted that Dr. Van Kirk diagnosed Rios with "chronic cervical
musculoligamentous strain or sprain likely associated with degenerative disc disease and possible
disc bulging, chronic lumbosacral musculoligamentous strain or sprain likely associated with
degenerative disc disease, and rotator cuff tendinitis of the left shoulder." *Id.* ALJ Benmour also
considered the functional limitations Dr. Van Kirk included in his report, namely that Rios "could
stand or walk for four hours with the option to rest periodically, sit for six hours, lift and carry
twenty pounds occasionally and ten pounds frequently, occasionally bend, stoop, crouch, climb,
kneel, balance, crawl, and push or pull, and no repetitive overhead reaching," and that Rios should
also avoid "concentrated exposure to extreme cold hazards." *Id.*

Fourth, ALJ Benmour gave "reduced weight" to the findings of a State agency medical

14

consultant's July 2011 findings that Rios "could engage in exertionally light activity with occasional postural limitations and occasional overhead reaching with his left upper extremity." *Id.* The consultant also "opined that the claimant should avoid concentrated exposure to extreme cold and hazards." *Id.* ALJ Benmour favored Dr. Van Kirk's examining opinion over that of the State agency medical consultant, noting that Dr. Van Kirk's opinion contained "slightly greater limitations." *Id.*

Fifth, ALJ Benmour noted that a "Social Security Administration claims representative met with the claimant in April 2010" and "indicated that she did not observe or perceive that the claimant had difficulty with comprehension, sitting, standing, walking, using his hands, or other functional abilities." *Id.*

Considering the above evidence, ALJ Benmour concluded that Rios's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Rios's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* ALJ Benmour found that Rios's "testimony was not entirely credible" for various reasons, including: (1) his dependency on his fiancée to assist him with basic tasks was "not supported by the mild objective evidence and findings on examination"; (2) Rios did not seek treatment "or even try to obtain treatment from a free clinic"; (3) Rios takes only over the counter ibuprofen for pain; (4) "[h]is description of his pain as a 15 on a one to ten pain scale seems highly exaggerated and not supported by the treatment notes of his treating doctor"; and (5) Rios's prior history of workers' compensation claim-related injuries "tends to discredit his credibility even more." *Id.* at 110.

ALJ Benmour also determined that Rios is unable to perform any past relevant work, crediting VE Greenberg's testimony that Rios is unable to perform any of his relevant work as a tree trimmer groundsman, phone card vendor, homecare provider, fruit packer, and calf raiser because each aforementioned occupation would require Rios to spend more than four hours per day standing and that Rios's "residual functional capacity was incompatible with his past relevant work." *Id.* at 110.

United States District Court
Northern District of California

**5. Step Five: Ability to Perform Other Jobs in the National Economy**

Finally, ALJ Benmour concluded that there are "jobs that exist in significant numbers in the national economy" that Rios can perform given his age, education, work experience, and residual functional capacity. *Id.* Because ALJ Benmour found that Rios's ability to perform a full range of light work "has been impeded by additional limitations," she asked VE Greenberg "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." *Id.* at 111. VE Greenberg testified that the individual would be able to work in "unskilled, exertionally light occupations" such as finish inspector and product assembler jobs. *Id.* Factoring in "fifty per cent erosion" to allow for periodic resting, VE Greenberg determined that the availability of such jobs totaled between 21,000 and 10,000 in California and between 1,000 and 645 in the Bay Area. *Id.* Based on VE Greenberg's testimony, ALJ Benmour concluded that Plaintiff was not disabled as defined in the Social Security Act and 20 C.F.R. §§ 404.1520(g) and 416.920(g). *Id.*

**F. Hearing on April 23, 2015**

After Rios initially sought review in this Court and the Court granted the Commissioner's ex parte motion for remand pursuant to sentence six of 42 U.S.C. § 405(g), ALJ Benmour held a second hearing in which she began her examination of Rios by focusing on his medical evidence, paying particular focus to more recent evidence. *See* Order on Ex Parte Mot. for Sentence Six Remand (dkt. 13) at 2; AR at 58–59. First, ALJ Benmour remarked that the most recent records she had from Dr. Touton were dated August 2011 and questioned Rios as to whether he had visited Dr. Touton since that time. AR at 59. Rios replied that he had not seen Dr. Touton. *Id.* Rios also stated that he attempted to see a physician but did not go to his appointment because he did not have medical insurance. *Id.* ALJ Benmour then asked Rios whether he had seen any doctor since Dr. Touton in August of 2011. Rios responded that he had not seen any doctors since that time because he could not afford to do so. *Id.* at 60–63.

Second, ALJ Benmour questioned Rios about his education and work history. Rios responded that he finished the eleventh grade but never acquired a General Equivalency Diploma. *Id.* at 63. With respect to his prior work experience, Rios stated that he had worked as a tree

trimmer, a health care provider, a phone card vendor, a calf raiser, and a fruit packer. *Id.* at 64. In response to ALJ Benmour's inquiry as to the reason why Rios stopped working in 2007, Rios stated that he sustained an injury in 2006 when he "got hit in the face at 80 feet up in the air by a tree limb" when "the tree guy dropped it and hit me." *Id.* at 65. Rios further explained that a doctor initially told him that there was nothing wrong with his neck that was visible in x-rays taken at a clinic the following day. *Id.* He also stated, however, that he had fractures on each side of his face from the incident. *Id.* Rios stated that he continued working for an additional eight months until he visited Dr. Touton and first heard of his neck injury after getting an MRI. *Id.* at 65–66. ALJ Benmour then asked Rios what Dr. Touton told Rios he was going to do regarding Rios's neck pain. *Id.* Rios replied that Dr. Touton told him not to have an operation because it would worsen his condition. *Id.* at 66.

Third, ALJ Benmour asked Rios about his current physical condition. Rios testified that he still constantly experiences the same sort of neck pain that he experienced following his 2006 injury. *Id.* With respect to medication, Rios stated that he takes 10,000 milligrams of ibuprofen daily and that he prefers ibuprofen to narcotics because he experienced stomach bleeding and nausea, and he did not want to be under the influence of a controlled substance. *Id.* Rios also stated that he smokes marijuana daily in twenty-to-forty-minute intervals, and that the only thing that seems to help him is lying flat on his back, which relieves the pressure from his neck. *Id.* at 66–67, 71. ALJ Benmour then questioned Rios as to whether Rios had attempted any other types of treatment to help manage his pain such as seeing a chiropractor or using hot or cold packs. Rios responded that he initially tried physical therapy in 2007 but that therapy "made things worse." *Id.* at 67. Rios testified that his pain and symptoms are getting worse in that Rios experiences "severe burning" throughout his body, his arms regularly fall asleep, his memory and motor commands "aren't working right," he has difficulty sitting down for long periods of time, and he experiences shooting pains "all day long." *Id.* at 68. Additionally, ALJ Benmour asked Rios about his ability to turn his head and lifting up his arms. Rios replied that he is unable to turn his head and that he is unable to lift up his left shoulder. *Id.* at 69–70.

Fourth, ALJ Benmour asked Rios about how he spends his time as well as his ability to

accomplish basic, daily tasks. Rios stated that he spends twelve to sixteen hours per day lying

down "because it's the only thing that relieves the pressure." *Id.* at 71. ALJ Benmour then asked

Rios how long he is able to sit before having to get up because of the pain. Rios answered that he

needs to stand after approximately twenty to twenty-five minutes of sitting. *Id.* at 73. Rios also

added that he has a "right foot drop" and that when he walks, his "right foot just gives out." *Id.*

ALJ Benmour then questioned Rios about his right foot drop, asking for how long and how far he

is able to walk before needing to stop due to pain. Rios explained that he has difficulty climbing

the eight stairs up to his cabin where he resides. *Id.* at 74. Rios also added that he has difficulty

lifting his arms. *Id.* Next, ALJ Benmour inquired whether Rios has difficulty with personal care.

Rios responded that his roommate helps him with his personal care and does all of the housework

and that he spends most of his time lying flat and watching television or praying. *Id.* at 76. ALJ

Benmour also questioned Rios about whether he "ever get[s] up or go[es] out or do[es] anything,"

and Rios replied that he drives thirteen miles to the grocery store when he "feel[s] up to it" and

that he waits in the car while his roommate purchases groceries. *Id.* at 71. ALJ Benmour then

asked whether Rios's roommate was working and how Rios was able to pay rent on the cabin.

Rios replied that his roommate is on Social Security and that his cousin has been providing

financial assistance for his rent and food costs. *Id.* at 76–77.

       Fifth, after reviewing Rios's work history, ALJ Benmour questioned VE Hughes as to

whether there were any skills from Rios's work history that transferred to sedentary work. VE

Hughes replied that there were no skills transferable to sedentary work. *Id.* at 79. ALJ Benmour

then asked VE Hughes a series of hypotheticals regarding an individual of Rios's age, education,

work experience, and limitations. In the first hypothetical, ALJ Benmour asked VE Hughes to

consider the following limitations:

> Lifting and carrying 20 pounds occasionally and 10 frequently;
> sitting, standing, walking six hours each in an eight-hour day; no
> climbing of ladders, ropes, or scaffolds; stooping, kneeling,
> crouching, and crawling; occasional overhead reaching with the
> non-dominant, left upper extremity; and all other reaching with the
> left uper extremity is frequent; must avoid concentrated exposure to
> cold and hazards; and limited to simple, repetitive tasks.

*Id.* at 80. VE Hughes testified that the individual could perform unskilled, light jobs such as a

housekeeping cleaner, a photocopy machine operator, and an office helper. *Id.* at 81. VE Hughes testified that there are: (1) 20,000 to 25,000 housekeeping cleaner jobs in California; (2) 1,500 photocopy machine operator jobs in California; and (3) 2,000 office helper jobs in California. *Id.* ALJ Benmour then added the limitation that "[a]ctivities that require frequent turning of the neck in a prolonged flexed or extended position can only be done occasionally" and asked VE Hughes if that changed his prior response. *Id.* at 82. VE Hughes testified that it did not. *Id.* Then, ALJ Benmour asked VE Hughes to "assum[e] that [ALJ Benmour] found [Rios's] testimony credible" and add the final limitation that the individual would miss work about two or three times a week. *Id.* ALJ Benmour asked VE Hughes whether there were any jobs that the individual, given the aforementioned limitations, could do. VE Hughes responded that there were no jobs the individual could do "in competitive employment." *Id.*

Lastly, ALJ Benmour asked Rios whether he had any questions for VE Hughes. Rios replied that he did not have any questions for VE Hughes and instead explained his failure to file a reconsideration in his earlier application from October of 1995. *Id.* at 83. Rios stated he went to a Social Security physician who informed him that he was disabled and would receive $400 per month. Rios then stated that he told the physician in response, "Doc, I can't live on $400 a month." *Id.* Rios explained he "was never told [he] could get Social Security plus work" and therefore elected not to request reconsideration but instead "went and . . . worked 14 years." *Id.*

### G. Unfavorable Decision Dated July 31, 2015

#### 1. Step One: Substantial Gainful Activity

ALJ Benmour began her analysis by noting that Rios met the insured status requirements of the Social Security Act through December 31, 2014. *Id.* at 9. Next, ALJ Benmour found that Rios has not engaged in substantial gainful employment since December 17, 2009. *Id.*

#### 2. Step Two: Severe Impairments

ALJ Benmour determined that Rios has the following impairments: (1) degenerative disc disease of the cervical spine; (2) left shoulder rotator cuff tear; (3) obesity; and (4) lumbar spine strain. *Id.* at 9. ALJ Benmour found that "[t]he above impairments cause significant limitations in claimant's ability to perform basic work activities." *Id.* Regarding Rios's mental impairments,

ALJ Benmour determined that Rios's "medically determinable mental impairments of substance use disorder and anxiety . . . do not cause more than a minimal limitation" in Rios's ability to "perform basic mental work activities" and are thus nonsevere. *Id.* In making these determinations, ALJ Benmour considered the following four functional areas: (1) daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* at 10. ALJ Benmour found that Rios experiences a mild limitation with respect to the first three functional areas and no limitation with respect to the fourth functional area. *Id.*

### 3. Step Three: Medical Severity

ALJ Benmour found that Rios "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." *Id.* ALJ Benmour first noted that obesity is not a listed impairment but considered the "combined effects" of Rios's obesity when evaluating his impairments "by assessing the effect obesity has" on his ability to "perform routine movement and necessary physical activity within the work environment." *Id.* Next, ALJ Benmour found that Rios's shoulder injury failed to meet or equal the listing requirements for the major dysfunction of a joint. *Id.* Lastly, ALJ Benmour concluded that Rios's degenerative disc disease did not meet or equal the Listing requirements for a spinal disorder "because the record does not demonstrate compromise of a nerve root" or the spinal cord with the any of the required additional findings. *Id.* at 10–11.

### 4. Step Four: Residual Functional Capacity

ALJ Benmour concluded that Rios has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with the following exceptions:

> [H]e can lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit and stand and/or walk for six hours in an eight-hour workday; cannot climb ladders, ropes, or scaffolds and can occasionally reach overhead with the left upper extremity and frequently do all other reaching with the left upper extremity; can occasionally engage in activities that require frequent turning of the neck and holding the neck in a prolonged flexed or extended position; must avoid concentrated exposure to extreme cold and hazards; and is limited to simple, repetitive tasks.

*Id.* at 11. In reaching this determination, ALJ Benmour "considered all symptoms and the extent

to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* While ALJ Benmour found that Rios's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," she also determined that Rios's statements regarding "the intensity, persistence, and limiting effects" of his symptoms were not entirely credible. *Id.* ALJ Benmour incorporated by reference the summary of the medical evidence as presented in her earlier opinion from August of 2012. *Id.* She then turned to the new evidence that had been added to the record and concluded that while Rios "has certain limitations," he is "not precluded from all work activity" and that the record ultimately "fails to support a finding of disability," *Id.* at 12.

In reaching that conclusion, ALJ Benmour first considered the February 2009 and August 2011 assessments by Dr. Touton. ALJ Benmour noted that in his February 2009 assessment, Dr. Touton "stated there was evidence of a cervical injury with radiculitis but no defined active radiculopathy." *Id.* Similarly, ALJ Benmour noted that in his August 2011 assessment, Dr. Touton stated that Rios's "shoulders seemed to be functioning satisfactorily" without symptoms of cervical radiculopathy. *Id.* ALJ Benmour also noted that Dr. Touton prescribed hydrocodone at that time. *Id.* Furthermore, ALJ Benmour noted that Rios "has not had any treatment since 2011" with the exception of a visit to Lakeside Clinic eight months before the hearing on April 23, 2015. *Id.*

Second, ALJ Benmour considered and attributed "great weight" to consultative examiner Dr. Benrazavi's March 2014 report because ALJ Benmour found the report to be "consistent with the record as a whole." *Id.* Dr. Benrazavi found that Rios was "able to lift and carry 20 pounds occasionally, and 10 pounds frequently, stand and walk up to six hours in an eight-hour work day, and sit for six hours in an eight-hour work day due to an impression of cervical degenerative disc disease." *Id.* Additionally, Dr. Benrazavi's report "stated that activities that require frequent turning of the neck or holding the neck in prolonged flexed or extended positions are limited to occasional, and working above the head was limited to occasional with the upper left extremity." *Id.*

Third, ALJ Benmour considered Rios's testimony in light of the medical evidence. With

21

respect to Rios's testimony that he spends twelve to sixteen hours lying flat on the floor and that his roommate assists him with his personal care, ALJ Benmour found that "nothing in the treating records supports this level of inability to function." *Id.* ALJ Benmour reasoned that if Rios "suffered to the extent alleged, it is likely that he would have sought treatment and would be prescribed stronger medication than Ibuprofen as well as other treatment modalities." *Id.* at 13. Additionally, ALJ Benmour noted that Rios's responses to an exertional medical questionnaire dated March of 2014 were inconsistent with his testimony that he is able to lift about ten pounds. *Id.*

Fourth, ALJ Benmour found that Dr. Van Kirk's consultative examination from June of 2011 "basically supports the residual functional capacity with the exception of an opinion that [Rios] can stand and/or walk for four hours in an eight-hour work day and needs to rest periodically." *Id.* at 14. ALJ Benmour concluded that Dr. Van Kirk did not have any "support in the consultative examination" for including postural limitations in his report because Rios's tests were normal during the exam. *Id.* ALJ reasoned that that Dr. Van Kirk "thus appeared to base his opinion on claimant's report that he could not stand for long periods of time rather than on any objective basis." *Id.*

Fifth, ALJ Benmour explained that she attributed "minimal weight" to records submitted following the hearing because "they contain several items that are redacted, crossed out, or obscured, making it difficult to read and understand these records."[6] *Id.* ALJ Benmour noted,

_____

[6] ALJ Benmour stated that Rios submitted the following records after the April 2015 hearing:
    1.    Orthopedic consultation by S.S. Shantharam, M.D., dated August 6, 2007. *See* AR 689 (reproduced in part, partially obscured).
    2.    Primary treating physician's report from the State of California, Office of Workers' Compensation, dated October 5, 2007. *See* AR 690.
    3.    Injury status report from Central Valley Comprehensive Care, Inc. Industrial Services dated October 18, 2007. *See* AR at 686 (partially obscured).
    4.    Progress note by S.S. Shantharam, M.D., dated November 15, 2007. *See* AR 691 (partially obscured).
    5.    Primary treating physician's progress report from the State of California, Office of Workers' Compensation, dated January 10, 2008. *See* AR 687.
    6.    Injury status report from Central Valley Comprehensive Care, Inc. Industrial Services dated January 10, 2008. *See* AR at 688 (partially obscured).
    7.    MRI ordering diagnosis of the cervical spine by H. Tookoian, M.D., dated July 18,

however, that "there does not appear to be anything in these records that contradicts the other evidence or that is contrary to residual functional capacity found therein." *Id.*

In assessing all of the above evidence, ALJ Benmour concluded that Rios "has had only very conservative or no treatment, he takes only Ibuprofen for pain, and no treating doctor has indicated he cannot do some type of work." *Id.* at 14. In limiting Rios to light, non-repetitive work, ALJ Benmour stated that she "accounted" for his pain. *Id.* Additionally, ALJ Benmour found that Rios is "unable to perform any past relevant work," as all of his prior work experience exceeded his residual functional capacity. *Id.*

### 5. Step Five: Ability to Perform Other Jobs in the National Economy

ALJ Benmour initially noted that a residual functional capacity indicating an ability to "perform the full range of light work" would result in a finding of "not disabled," however, she found it was necessary to determine how Rios's additional limitations "erode the unskilled light occupational base." *Id.* ALJ Benmour credited VE Hughes' testimony that an individual of Rios's age, education, work experience, and residual functional capacity could work in various representative occupations such as a housekeeping cleaner, a photocopy machine operator, and an office helper. *Id.* Furthermore, ALJ Benmour noted the aforementioned occupations exist in "significant numbers in the national economy." *Id.* at 16. Accordingly, ALJ Benmour concluded that Rios "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and that "a finding of 'not disabled' is therefore appropriate." *Id.* at 16.

### H. Motions for Summary Judgment

#### 1. Rios's Motion for Summary Judgment

Rios filed a Complaint seeking review of ALJ Benmour's decision and moves for summary judgment on the basis that ALJ Benmour "left out very important evidence" concerning

---

2008. *See* AR 694.
     8.     Examination report by Charles H. Touton, M.D., dated February 2, 2009. *See* AR 696.
     9.     Comprehensive re-evaluation by Geoffrey M. Miller, M.D., F.A.C.S., F.I.C.S., dated November 20, 2010. *See* AR at 698 (reproduced in part, partially obscured).

his impairments in her unfavorable decision dated July 31, 2015.  Pl.'s Mot. at 3.  Rios contends that ALJ Benmour omitted the following evidence in making her determination:

1.     Examination report by Donald L. Hager, M.D., dated August 26, 1996.  *See* AR 598, 636, 674 (partially obscured).

2.     Orthopedic consultation by S.S. Shantharam, M.D., dated August 6, 2007.  *See* AR 591, 689 (reproduced in part, partially obscured).

3.     Primary treating physician's report from the State of California, Office of Workers' Compensation, dated October 5, 2007.  *See* AR 690.

4.     Progress report by S.S. Shantharam, M.D., dated October 16, 2007.  *See* AR at 589, 684 (partially obscured).

5.     Injury status report from Central Valley Comprehensive Care, Inc. Industrial Services dated October 18, 2007.  *See* AR at 686 (partially obscured).

6.     Progress note by S.S. Shantharam, M.D., dated November 15, 2007.  *See* AR 595, 691 (partially obscured).

7.     Primary treating physician's progress report from the State of California, Office of Workers' Compensation, dated January 10, 2008.  *See* AR 687.

8.     Injury status report from Central Valley Comprehensive Care, Inc. Industrial Services dated January 10, 2008.  *See* AR at 688 (partially obscured).

9.     Comprehensive re-evaluation by Geoffrey M. Miller, M.D., F.A.C.S., F.I.C.S., dated November 20, 2010.  *See* AR at 608, 698 (partially obscured).

10.    Testimony of VE Hughes during the hearing dated April 23, 2015.  See AR at 53.

Rios also enclosed medical records from visits he has attended since ALJ Benmour issued her unfavorable decision on July 31, 2015.  The medical records are as follows:

11.    Diagnostic imaging report concerning an x-ray of Rios's thoracic spine by Steven Wirth, M.D., dated June 20, 2016.  *See* Pl.'s Mot. at 12.

12.    Diagnostic imaging report concerning an x-ray of Rios's cervical spine by Steven Wirth, M.D., dated June 20, 2016.  *See* Pl.'s Mot. at 13.

13.    Diagnostic imaging report concerning an x-ray of Rios's eye by Steven Wirth,

M.D., dated June 20, 2016.  *See* Pl.'s Mot. at 14.

14.     Report by Steven Wirth, M.D., dated December 8, 2016.  The report discusses Rios's MRI performed on July 19, 2016.  *See* Pl.'s Mot. at 10–11.

### 2. Rios's Final Argument

In a filing captioned as his "Final Argument," Rios discussed his reasons for failing to request consideration concerning the applications he filed in 1995 for disability insurance benefits and supplemental security income pursuant to Title II and Title XVI, respectively.  Final Argument (dkt. 29) at 2.  According to Rios, he went to see an "SSQ Doctor," who informed Rios that he was only "partial[ly] disabled" and that his "benefits would only be about $400.00 a month."  *Id.* at 2-3.  Rios informed the doctor that he could not "live on $400.00 a month" and that he needed to "find . . . a job to support [his] family."  *Id.* at 3.  Rios contends that "he left" and "favored [his] left hand-arm-shoulder for his right hand-arm-shoulder."  *Id.*

Rios also contends that ALJ Benmour erred in her unfavorable decision from July of 2015 when she found that certain evidence was added after the April 2015 hearing.  According to Rios, ALJ Benmour was incorrect in her determination that certain evidence was submitted after the April 2015 hearing.[7]  Rios asserts that he submitted different documents following the April 2015

---

[7] Rios contends that ALJ Benmour was incorrect in her determination that the following evidence was submitted after the April 2015 hearing:

1.     Examination report by Donald L. Hager, M.D., dated August 26, 1996.  *See* AR 674 (partially obscured).

2.     Orthopedic consultation by S.S. Shantharam, M.D., dated August 6, 2007.  *See* AR 689 (reproduced in part, partially obscured).

3.     Primary treating physician's report from the State of California, Office of Workers' Compensation, dated October 5, 2007.  *See* AR 690.

4.     Progress report by S.S. Shanthraram, M.D., dated October 16, 2007.  *See* AR 684 (partially obscured).

5.     Injury status report from Central Valley Comprehensive Care, Inc. Industrial Services dated October 18, 2007.  *See* AR at 686 (partially obscured).

6.     Progress note by S.S. Shantharam, M.D., dated November 15, 2007.  *See* AR 691 (partially obscured).

7.     Primary treating physician's progress report from the State of California, Office of Workers' Compensation, dated January 10, 2008.  *See* AR 687 (partially obscured).

8.     Injury status report from Central Valley Comprehensive Care, Inc. Industrial Services dated January 10, 2008.  *See* AR at 688 (partially obscured).

9.     MRI report of Rios's cervical spine by H. Tookoian, M.D., dated July 18, 2008.

hearing.[8]

### 3. Commissioner's Cross-Motion for Summary Judgment

The Commissioner filed a cross-motion for summary judgment, asking the Court to affirm ALJ Benmour's decision that Rios was not disabled. Def.'s Mot. (dkt. 31) at 2. The Commissioner contends that Rios's assertions are without merit because ALJ Benmour's decision is free of reversible error and is supported by substantial evidence. *Id.* at 4. Additionally, the Commissioner asserts that the additional medical evidence from Rios acquired after ALJ Benmour issued her unfavorable decision on July 31, 2015 "does not meet the standard for a remand as it is not material." *Id.*

First, the Commissioner contends that ALJ Benmour's decision is free of reversible error and supported by substantial evidence because ALJ Benmour rendered her decision "after consideration of all of the evidence." *Id.* at 5. The Commissioner asserts that many of Rios's diagnoses concern his neck and left shoulder and that ALJ Benmour "accounted for these conditions" by finding he had severe impairments with respect to his neck and left shoulder and incorporating "significant limitations in his residual functional capacity." *Id.* With respect to repetitive use of Rios's right hand, arm, and shoulder, the Commissioner asserts that: (1) a report from September 1994 that Dr. Hager references in his report from August of 1996 "appears to be internally inconsistent"; (2) the September 1994 report predates Rios's alleged disability onset date in December of 2009; (3) Dr. Hager's report stated "only that [Rios] could not return to his prior work as a feeder of dairy cows"; (4) Rios worked as a manual laborer at least during 2006 and 2007; and (5) ALJ Benmour considered all of the evidence, including Rios's prior right hand surgery, to conclude that Rios could not perform his prior work in heavy and medium occupations.

---

*See* AR 694 (partially obscured).

      10.    Examination report by Charles H. Touton, M.D., dated February 2, 2009. *See* AR 696.

      11.    Comprehensive re-evaluation report by Dr. Geoffrey M. Miller, M.D., F.A.C.S., F.I.C.S., dated November 20, 2010. *See* AR 698 (reproduced in part, partially obscured).

[8] Rios contends instead that he submitted the following documents after the April 2015 hearing:

      1.    Examination report by Donald L. Hager, M.D., dated August 26, 1996. *See* AR at 598.

      2.    Comprehensive re-evaluation report by Dr. Geoffrey M. Miller, M.D., F.A.C.S., F.I.C.S., dated November 20, 2010. *See* AR 608.

*Id.* at 5–6. Additionally, the Commissioner contends that "the record fails to reveal any defined active radiculopathy" and that the evidence fails to establish that Rios has any limitations that are inconsistent with ALJ Benmour's determination of Rios's residual functional capacity. *Id.* at 6. Furthermore, the Commissioner asserts that Rios has failed to demonstrate prejudice and that ALJ Benmour properly concluded that Rios was not disabled "after considering all the evidence and relying on the testimony of a vocational expert." *Id.* at 7–8.

Second, the Commissioner argues that the new evidence that Rios has submitted since ALJ Benmour's unfavorable decision dated July 31, 2015, does not merit a remand because it is not new and material in accordance with sentence six of 42 U.S.C. § 405(g). *Id.* at 9. The Commissioner asserts that "the new evidence, at best, shows a more recent worsening of Plaintiff's condition and is unlikely to change the ALJ's decision." *Id.*

### 4. Rios's Opposition

In his Opposition, Rios contends that he has sufficient evidence to prove impairments that meet or equal listing requirements. Opp'n (dkt. 32) at 2. With respect to his left shoulder and left elbow, Rios asserts that he meets or equals Listing 1.02 for a major dysfunction of a joint. *Id.* at 3–4. Additionally, Rios contends that he obtained additional x-rays and an MRI since ALJ Benmour's unfavorable decision dated July 31, 2015 so as to satisfy his burden of proof that his injuries meet or equal Listing 1.04 for a spinal disorder. *Id.* at 7–8. He also asserts that the new medical evidence "show[s] all past injuries" and that he does not have any new injuries. *Id.* at 8.

## III. ANALYSIS

### A. Legal Standard Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen*, 80 F.3d at 1279 (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

**B.    Legal Standard for the Evaluation of Medical Opinions**

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Id* at 1202 (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

"If a treating or examining doctor's opinion is contradicted by

another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012–13. Thus, failure to mention a treating physician's opinion without providing specific and legitimate reasons supported by substantial evidence constitutes an error. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1172–73 (9th Cir. 2015) ("Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them.").

### C.   Legal Standard for Evidence that Predates the Onset Date of Disability

"Medical opinions that predate the alleged onset disability are of limited relevance." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (citing *Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989)). The Ninth Circuit, however, has held that the ALJ is required to consider "all medical opinion evidence." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)). In an unpublished opinion, the Ninth Circuit applied this rule to include evidence that predates the alleged onset date of disability. *See Williams v. Astrue*, 493 F. App'x 866, 868 (9th Cir. 2012). In another unpublished opinion, the Ninth Circuit held that the ALJ may reject medical evidence that predates the alleged onset disability date "in favor of more recent opinions" when the more recent medical opinion recent

United States District Court
Northern District of California

evidence is "consistent with the record as a whole." *Brown v. Comm'r of Soc. Sec.*, 532 F. App'x 688, 689 (9th Cir. 2013) (citation and internal quotation marks omitted). The Court is unaware of published Ninth Circuit authority addressing the issue and finds the reasoning of the memorandum dispositions in *Williams* and *Brown* persuasive.

### D. Legal Standard for Evaluation of Claimant's Testimony and Credit-as-True Rule

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick*, 157 F.3d at 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112.

"Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Ligenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 112; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009); *Vasquez*, 575 F.3d at 591–93 (concluding that an ALJ failed to provide "specific, clear, and convincing" reasons to support an an adverse credibility determination). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks omitted and quoting *Lester*, 81 F.3d at 834); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.").

"In evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). "An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment. However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide specific, cogent reasons for the disbelief." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citations omitted). The ALJ is required to "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* (alterations in original; citations omitted). "Where, as here, the ALJ did not find affirmative evidence that the claimant was a malingerer, those reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* (internal quotation marks and citations omitted).

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits if three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* 1019–21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1399 (9th Cir. 1988)).

### E.   Legal Standard for Harmless Error

The Ninth Circuit applies a harmless error analysis to social security appeals. *McLeod v.*

*Astrue*, 640 F.3d 881, 887 (9th Cir. 2011); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("We have long recognized that harmless error principles apply in the Social Security Act context."); *see also Marsh*, 792 F.3d at 1172 (holding harmless error applies to determine the impact of an ALJ's failure to mention a treating physician and his notes). The application of the harmless error analysis is "fact-intensive," as "no presumptions operate," and courts "must analyze harmlessness in light of the circumstances of the case." *Marsh*, 792 F.3d at 1172 (citing *Molina*, 674 F.3d at 1121). "ALJ errors in social security cases are harmless if they are 'inconsequential to the ultimate nondisability determination' and . . . 'a reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* at 1173 (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006)). In *McLeod*, the Ninth Circuit held that "remand is appropriate" when "the circumstances of the case show a substantial likelihood of prejudice." 640 F.3d at 888. Alternatively, the court explained that "where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *Id.* Furthermore, the court also found that, "despite the burden to show prejudice being on the party claiming error by the adminitrative agency, the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 410–11 (2009)). Lastly, courts "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (citing *SEC v. Chenery Corp*, 332 U.S. 194, 196 (1947)).

### F. Discussion

As Rios contends that ALJ Benmour left out "very important evidence" concerning his impairments, the Court will discuss in turn each piece of evidence that Rios alleges ALJ Benmour omitted from her unfavorable decision dated July 31, 2015. *See* Pl.'s Mot. at 3.

#### 1. Examination Report by Donald L. Hager, M.D., Dated August 26, 1996

The first piece of evidence that Rios argues ALJ Benmour failed to consider is an examination report by Donald L. Hager, M.D. *See* AR 598, 636. In both his Title II application

for disability benefits and his Title VXI application for supplemental security income, Rios

alleged a disability onset date of December 17, 2009.  AR at 39.  Dr. Hager's report from August

of 1996 thus predates the alleged onset date of Rios's disabilities by several years.  While ALJ

Benmour did not mention Dr. Hager's report in her 2015 unfavorable opinion, she did

acknowledge that Rios "had a history of surgery on [his] right hand in the remote past."  AR 12.

ALJ Benmour erred when she failed to consider Dr. Hager's report from August of 1996 in

her 2015 unfavorable decision.  While the Ninth Circuit has held that medical opinion evidence

that predates the alleged onset disability date is of "limited relevance," as discussed above, the

Ninth Circuit has also held, albeit in an unpublished disposition, that an ALJ must consider all

medical opinion evidence, including evidence that predates the alleged onset disability date.

*Williams*, 493 F. App'x at 868 (quoting *Carmickle*, 533 F.3d at 1165).  In *Williams v. Astrue*, the

Ninth Circuit found that the ALJ "erred in silently disregarding" medial opinion evidence that

predated the claimant's alleged onset date and concluded that the ALJ should have considered all

medical opinion evidence.  *Id.*  Accordingly, ALJ Benmour should have considered Dr. Hager's

report even though it predates Rios's alleged disability onset date.

ALJ Benmour's failure to consider Dr. Hager's report is not a harmless error because ALJ

Benmour's residual functional capacity determination limited Rios to "simple, repetitive tasks"

but did not account for Dr. Hager's assessment that Rios was permanently disabled in his right

hand and that Rios should avoid "repetitive gripping, pushing, pulling, and twisting, and sustained

forceful grasping."  AR at 643.  Because the wording of the residual functional capacity

determination could result in Rios being required to repetitive work with his right hand in such a

way that contradicts Dr. Hager's work limitations, the Court cannot conclude that this error was

harmless.

### 2. Orthopedic Consultation, Progress Report, and Progress Note by S.S. Shantharam, M.D.

The second category of evidence that Rios contends ALJ Benmour failed to consider in

her unfavorable decision from 2015 is findings by S.S. Shantharam, M.D.  *See* AR 589–95, 691.

Dr. Shantharam saw Rios on multiple occasions and primarily focused on evaluating and treating

Rios's left shoulder, although Dr. Shantharam also focused on Rios's left elbow in an orthopedic consultation on August 6, 2007. *See* AR 589–95. Findings in the orthopedic consultation included that Rios "has impingement disease possibly rotator cuff tear" as well as "a tennis elbow on the left side possibly epicondylitis." *Id.* at 593. After recommending that Rios get an MRI, Dr. Shantharam saw Rios on October 16, 2007. The diagnostic report from the MRI indicated that Rios had "tendonitis in the supraspinatus tendon and infraspinatus tendon area and some degenerative changes of the AC joint and non-specific changes in the humeral head." *Id.* at 589. In a progress note dated November 15, 2007, Dr. Shantharam recommended that Rios return to work "with no lifting, pushing, or pulling or overhead work." *Id.* at 595. Because Dr. Shantharam saw Rios in 2007, Dr. Shantharam's medical opinion evidence predates Rios's alleged disability onset date.

ALJ Benmour concluded that Rios "can occasionally reach overhead with the left upper extremity and frequently do all other reaching with the upper left extremity." *Id.* at 11. In her unfavorable decision, ALJ Benmour failed to mention Dr. Shantharam, a treating physician, by name or specifically discuss any of Dr. Shantharam's findings. She did, however, incorporate "[t]he summary of medical evidence set forth in the prior ALJ decision of August 2, 2012 . . . by reference," which included Dr. Shantharam's findings. AR 11.

ALJ Benmour's residual finding capacity determination appears to favor the conclusion by Dr. Benrazavi, an examining physician, that Rios should limit the use his left upper extremity for overhead work to occasional instances, as opposed to Dr. Shantharam's finding that Rios refrain from "lifting, pushing, or pulling or overhead work." *See* AR at 653, 595. In accordance with the substantial evidence standard, however, Dr. Shantharam's opinion, as a treating physician, is entitled to "greater weight" than Dr. Benrazavi's opinion as an examining physician. *Garrison*, 759 F.3d at 1012. Furthermore, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] [her] interpretation thereof, and mak[e] findings." *Id.* (quoting *Reddick*, 157 F.3d at 725).

The fact that Dr. Shantharam's findings predate Rios's alleged disability onset date does not, by itself, change the Court's conclusion that ALJ Benmour should have considered Dr.

Shantharam's opinions. As discussed above, the Ninth Circuit has held that an ALJ cannot "silently disregard[]" medical opinion evidence that predates a claimant's alleged disability onset date. *Williams*, 493 F. App'x at 868. Furthermore, as also mentioned above, when more recent medical opinion evidence is consistent with the record as a whole, an ALJ may reject older medical opinion evidence in favor of the more recent medical opinion evidence. *Brown*, 532 F. App'x at 689. Dr. Benrazavi's findings are consistent with the record as a whole. For example, Dr. Van Kirk, an examining physician, found that Rios "should do the lifting and carrying mainly with the right upper extremity" as opposed to with his left upper extremity. AR at 561. This differs from Dr. Shantharam's finding that Rios could return to work "with no lifting, pushing, or pulling or overhead work." *Id.* at 595. Thus, it could have been possible for ALJ Benmour to reject Dr. Shantharam's findings in favor of those of Benrazavi. The Court concludes, however that ALJ Benmour erred because she failed to consider Dr. Shantharam's findings and indicate the reasons why she credited Dr. Benrazavi's findings and work limitations pertaining to Rios's use of his upper left extremity over those of Dr. Shantharam.

This error is not harmless because ALJ Benmour omitted the findings of Dr. Shantharam, a treating physician, from her decision. ALJ Benmour's opinion should have included a thorough summary of Dr. Shantharam's opinion as well as her reasons for favoring Dr. Benrazavi's findings. Because there is an insufficient explanation as to why ALJ Benmour fashioned Rios's residual functional capacity in the way that she did, the Court cannot conclude that this error was harmless. *See Garrison*, 759 F.3d at 1012.

### 3. Reports from Central Valley Comprehensive Care, Inc. and the State of California, Office of Workers' Compensation

The third category of evidence that Rios contends ALJ Benmour failed to consider in her 2015 unfavorable decision consists of injury status reports and primary treating physician reports generated at Central Valley Comprehensive Care, Inc. *See* AR 686–88, 690. The record contains two injury status reports from Central Valley Comprehensive Care, Inc. as well as two primary treating physician reports from the State of California, Office of Workers' Compensation. Physicians signed all four reports, and they were executed at Central Valley Comprehensive Care,

Inc. between October of 2007 and January of 2008.  All four reports pertain to Rios's left shoulder, and one of the reports also discusses Rios's left elbow.  *See id*.  Some portions of these records, such as diagnoses and work restrictions, appear to have been highlighted, as the underlying text is still partially visible.  It seems as though these records were then sent via fax or scanned in black and white to become part of the record, which darkened the highlighted sections and made them illegible.  It is fairly likely that these portions of the reports were not redacted, however, as then the text would be completely obscured.  The fact that the marks obscure some of the most important sections of the reports further supports the inference that they originated as highlighting.  All of these reports predate Rios's alleged disability onset date.

"In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)(citation omitted).  "This duty extends to the represented as well as to the unrepresented claimant.  When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted).  "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry."  *Id.* (internal quotation marks and citations omitted).  The ALJ can satisfy this duty in a variety of ways, including "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."  *Id.* (citations omitted).

ALJ Benmour attributed "minimal weight" to these records "because they contain several items that are redacted, crossed out, or obscured, making it difficult to read and understand these records."  AR at 14.  Accordingly, the Court must determine whether ALJ Benmour failed to adequately develop the record with respect to these four reports.  The Court concludes that ALJ Benmour has erred in failing to adequately develop the record concerning these reports because ALJ Benmour's characterization of these records from treating physicians, namely that they were difficult to read and understand, constitutes a finding that the "record is inadequate to allow for proper evaluation of the evidence."  *Tonapetyan*, 242 F.3d at 1150.  While ALJ Benmour noted

36

that "there does not appear to be anything in these records that contradicts the other evidence or that is contrary to residual functional capacity therein," work limitations as well as diagnoses from treating physicians are illegible on these records. AR at 14; *id.* at 687–89. The fact that these records predate Rios's alleged disability onset date does not alter the Court's conclusion that ALJ Benmour failed to adequately develop the record. As stated above, an ALJ has a "special duty" to develop the record, and an ALJ must be "especially diligent" when, as here, the claimant is unrepresented. *Tonapetyan*, 242 F.3d at 1150. Because it is impossible to discern whether the illegible portions of the records conflict with ALJ Benmour's residual functional capacity determination, the Court concludes that ALJ Benmour should have more fully developed the record.

ALJ Benmour's failure to adequately develop the record with respect to reports from treating physicians is not a harmless error. As stated above, these records contained diagnoses and work restrictions that are illegible as presented in the record. Because the Court is unable to read segments of these records, the Court is unable to conclude that the error was harmless.

### 4. Comprehensive Re-Evaluation by Geoffrey M. Miller, M.D., F.A.C.S., F.I.C.S.

Dr. Miller performed a comprehensive orthopedic re-evaluation on November 20, 2010. In his re-evaluation, Dr. Miller noted that his exam of Rios "did not show any specific objectives in the neck or the left shoulder," which was "consistent with the records of Dr. [Shantharam] as well as Dr. Touton." AR at 610. Dr. Miller noted that he "had difficulty rating [Rios] for the lack of objectives but . . . concluded a non-verified radiculopathy would make sense" and ultimately "agreed with Dr. Touton's rating." *Id.* As mentioned above, the record does not contain Dr. Miller's report in its entirety.

ALJ Benmour did not mention Dr. Miller's report in either of her unfavorable opinions. The issue for the Court is whether ALJ Benmour's failure to discuss Dr. Miller's findings constitutes an error. The Court finds that it does. As discussed above, Dr. Miller's report appears to be incomplete in the record. *See* AR 608. The document's own Table of Contents indicates that the document is at least 6 pages in length, and the administrative record only contains the first

three pages of the document. *See id.* at 608–10. The pages in the administrative record discuss Rios's interim history and Dr. Miller's review of his medical file, but subsequent pages concerning Rios's present status, Dr. Miller's physical examination of Rios, as well as Dr. Miller's comment and overall opinion are missing from the record. *See id.*

"In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)(citation omitted). "This duty extends to the represented as well as to the unrepresented claimant. When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry." *Id.* (internal quotation marks and citations omitted). The ALJ can satisfy this duty in a variety of ways, including "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id.* (citations omitted).

ALJ Benmour erred when she failed to adequately develop the record and include the entirety of Dr. Miller's comprehensive re-evaluation. Because pages containing Dr. Miller's medical opinion of Rios are absent from the record, the Court is unable to conclude that the error was harmless.

### 5. Rios's Credibility and VE Hughes's Testimony During the Hearing on April 23, 2015

At the hearing on April 23, 2015, ALJ Benmour asked VE Hughes to assume a hypothetical individual with Rios's age, education, work background, and the following limitations:

> Lifting and carrying 20 pounds occasionally and 10 frequently; sitting, standing, walking six hours each in an eight-hour day; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional overhead reaching with the non-dominant, left upper extremity; and all other reaching with the left upper extremity is frequent; must avoid concentrated exposure to extreme cold and hazards; and limited to simple, repetitive tasks.

38

United States District Court
Northern District of California

*Id.* at 80. After VE Hughes determined that the individual could not return to Rios's past work, ALJ Benmour asked whether there were other jobs in the regional or national economy that the individual could perform and also added the limitation that "[a]ctivities that require frequent turning of the neck or holding the neck in a prolonged flexed or extended position can only be done occasionally." *Id.* 81–2. VE Hughes responded that there were jobs that the individual could perform in the regional and national economy, such as a housekeeping cleaner, a photocopy machine operator, and an office helper. *Id.* ALJ Benmour then asked VE Hughes, assuming she determined Rios's testimony to be credible, whether there were any jobs the individual could perform if the individual missed work two to three times per week. VE Hughes responded that there were no jobs the person could do "in competitive employment." *Id.* at 82. ALJ Benmour did not include the final limitation that incorporated Rios's testimony regarding needing to miss work two to three times per week in her residual functional capacity determination. *Id.* at 11. The issue for the Court is thus whether ALJ Benmour erred in failing to incorporate this final limitation based on Rios's testimony. The Court concludes that ALJ Benmour failed to provide specific, clear, and convincing reasons for discrediting Rios's testimony and excluding the limitation from Rios's residual functional capacity determination.

ALJ Benmour satisfied the first step of the two-step inquiry regarding Rios's testimony. In her decision, ALJ Benmour found that Rios's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id.* at 11. ALJ Benmour did not identify any evidence of malingering and therefore was required to support her finding that Rios's testimony was not credible with clear and convincing reasons. *Lingenfelter*, 504 F.3d at 1036. Concerning the second step of the inquiry, ALJ Benmour discredited Rios's testimony regarding the severity of his pain due to his failure to seek treatment. Additionally, ALJ Benmour rejected Rios's testimony regarding his ability to function based on an inconsistency between his answer to an exertional questionnaire and his testimony at the hearing. Lastly, ALJ Benmour discredited Rios's testimony because it conflicted with Rios's treating records.

Concerning Rios's failure to seek treatment, ALJ Benmour noted that Rios had sought "no treatment since 2011 except for one visit to Lakeside Health Center" and that "[t]he only

39

medication that [Rios] takes is Ibuprofen."  ALJ Benmour found that Rios's testimony was not entirely credible, reasoning that if Rios "suffered to the extent alleged, it is likely that he would have sought treatment and would be prescribed stronger medication than Ibuprofen as well as other treatment modalities," although she did note earlier in her decision that Rios had been prescribed Hydrocodone in 2011.  *Id.* at 12–13.

The Ninth Circuit has held that evidence of conservative treatment as well as failure to seek treatment can constitute a clear and convincing reason to reject a plaintiff's testimony in social security cases.  *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (holding that a plaintiff's failure to seek treatment for back pain for three or four months consisted a clear and convincing reason to partially discredit the plaintiff's testimony regarding the severity of her back pain); *see also Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted).  The Ninth Circuit has also held, however, that a plaintiff's failure to seek treatment because the plaintiff could not afford it and did not have health insurance is not a clear and convincing reason to discredit the plaintiff's testimony.  *See Smolen*, 80 F.3d at 1284 (holding that a plaintiff's testimony that she had not sought treatment and, as a result, was not taking medication for her pain because she did not have health insurance and could not afford it did not constitute a clear and convincing reason to discredit her testimony).  At the hearing dated April 23, 2015, Rios testified that he tried to see a doctor at a clinic after his 2011 visit with Dr. Touton.  AR 60.  Rios testified that he did not go to the clinic, however, because he could not afford the costs and did not have insurance.  AR 60–61.  Accordingly, the Court finds that Rios's failure to seek treatment since 2011 is not a clear and convincing reason to discredit Rios's testimony concerning the severity of his symptoms, at least without some explanation of why his stated justification was not sufficient.

Second, ALJ Benmour discredited Rios's testimony because of an inconsistency between his testimony at the hearing dated April 23, 2015 and an answer that he provided in an exertional questionnaire dated March 10, 2014.  ALJ Benmour noted that Rios stated in the questionnaire that "he cannot lift or carry anything," which was "inconsistent with his testimony [at the hearing]

40

that he could lift about 10 pounds." *Id.* at 13. ALJ Benmour did not ask Rios about the

discrepancy at the April 2015 hearing. The Ninth Circuit has held that, "[i]n assessing the

claimant's credibility, the ALJ may use ordinary techniques of credibility evaluation, such as

considering the claimant's reputation for truthfulness and any inconsistent statements in her

testimony." *Tonapetyan*, 242 F.3d at 1148. While this inconsistency is clear, the Court does not

find it to be a convincing reason to reject the entirety of Rios's pain-related testimony because the

difference between his testimony that he had ability to lift "[m]aybe about ten pounds" and a prior

answer in a questionnaire that he was unable to lift anything is a minor discrepancy. AR 75.

Furthermore, it is worth noting that Rios's answer in the questionnaire is dated March 10, 2014—

more than a year before the hearing on April 23, 2015. Given that over a year had passed between

the time Rios provided his answer in the questionnaire and the time Rios gave his answer during

the April 23, 2015 hearing, it is possible that both answers could have been true at the time that

Rios gave them. It is perhaps also worth noting that Rios testified at the July 25, 2012 hearing that

he could lift about five pounds. *See* AR 248. Without further development of the record as to

potential reasons for this discrepancy in Rios's answers over time, such as whether Rios's answers

reflected an actual change in Rios's condition, this minor discrepancy does not constitute a clear

and convincing reason to discredit the entirety of Rios's pain-related testimony.

Third, ALJ Bemour discredited Rios's testimony concerning his disabling pain and

inability to complete basic, daily tasks. ALJ Benmour noted that Rios "testified that he spends

[twelve] to [sixteen] hours a day lying on the floor" and that his roommate helps Rios "in the

shower and with washing his hair." AR 12. ALJ Benmour concluded that "nothing in the treating

records supports this level of inability to function." *Id.* ALJ Benmour then reiterated that Rios

has only taken conservative medication and has not sought treatment since 2011 "except for one

visit to Lakeside Health Center eight months prior to the hearing." *Id.* at 13. The only other

reason ALJ Benmour relied on for discrediting Rios's testimony is that it conflicted with Dr.

Benrazavi's findings that Rios "was able to lift and carry 20 pounds occasionally, and 10 pounds

frequently, stand and walk up to six hours in an eight-hour workday, and sit for six hours in an

eight-hour workday due to an impression of cervical degenerative disc disease." *Id.* As discussed

above, Rios provided a potentially valid reason for not seeing a doctor since 2011 and taking only Ibuprofen that ALJ Benmour failed to address. *See Smolen*, 80 F.3d at 1284. The sole remaining justification on which ALJ Benmour relied to discredit Rios's testimony is that it is inconsistent with Dr. Benrazavi's findings. This is an insufficient reason to discredit Rios's testimony, however, as the Ninth Circuit has held that an ALJ "may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain" because "pain testimony may establish greater limitations than can medical evidence alone." *Burch*, 400 F.3d at 680. Accordingly, ALJ Benmour has not provided a clear and convincing reason to discredit Rios's testimony regarding the severity of his pain or his ability to complete basic, daily tasks. As discussed above, however, because the Court finds that the record has not been fully developed, the credit-as-true rule is inapplicable in this case.

### G. New Evidence from Steven Wirth, M.D.

In his Motion for Summary Judgment, Rios included new medical evidence obtained after the April 23, 2015 hearing before ALJ Benmour. *See* Pl.'s Mot. at 10–14. The evidence consists of: (1) a partial report from Steven Wirth, M.D., discussing an MRI that Rios had on July 19, 2016; (2) an x-ray report for x-rays performed on Rios's thoracic spine on June 20, 2016; (3) an x-ray report for x-rays performed on Rios's cervical spine on June 20, 2016; and (4) an x-ray report for x-rays performed on Rios's eye on June 20, 2016. *Id.* Accordingly, the Court must determine whether this new evidence is material and whether Rios has good cause for failing to present it in the prior proceeding. The Court finds that the evidence is not material and Rios has not provided good cause for submitting this new evidence to the Court for the first time.

#### 1. Legal Standard for Remand Based on New Evidence

Generally, the plaintiff "seeking remand [based on new evidence] must show 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (quoting 42 U.S.C. § 405(g)); *see also Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) ("To justify a remand, [the plaintiff] must show that the [new evidence] is material to determining her disability, and that she had good cause for having failed to

produce that evidence earlier.").

For the new evidence to be material under 42 U.S.C. § 405(g), it "must bear directly and substantially on the matter in dispute." *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir. 1984). Additionally, the plaintiff must also show "that there is a 'reasonable possibility' that the new evidence would have changed the outcome of the administrative hearing." *Mayes*, 276 F.3d at 462 (quoting *Booz* 734 F.2d at 1380–81). Furthermore, the plaintiff must demonstrate "that the new evidence is material to and probative of his condition as it existed at the relevant time—at or before the disability hearing." *Sanchez v. Sec'y of Health & Human Servs.*, 812 F.2d 509, 511 (9th Cir. 1987) (citing 42 U.S.C. § 416(i)(2)(G)).

In order for the plaintiff to demonstrate good cause, the plaintiff "must demonstrate that the new evidence was unavailable earlier." *Mayes*, 276 F.3d at 463. "If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative hearing, the good cause requirement is satisfied." *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985). In contrast the plaintiff "does not meet the good cause requirement by merely obtaining a more favorable report once his or her claim has been denied." *Mayes*, 276 F.3d at 463; *see also Allen*, 726 F.2d at 1473 ("The 'good cause' requirement would be meaningless if a claimant were allowed to introduce new evidence simply by obtaining a new opinion after a hearing.").

### 2. Materiality

With the exception of the x-ray of Rios's eye, all of the new evidence "bear[s] directly and substantially on the matter in dispute," because it pertains to a spinal injury that Rios contends he sustained when he was struck by a falling branch in September of 2006. *Booz*, 734 F.2d at 1380–81 (9th Cir. 1984) (citation omitted). Nevertheless, it is not "material" within the meaning of the term as applied by the Ninth Circuit in social security cases.

First, although Rios's cervical spine x-ray shows that Rios may have experienced some degenerative changes in his condition, the Ninth Circuit has held that degenerative changes associated with a condition that was in dispute at a prior proceeding "would be material to a new application, but not probative of his condition at the hearing." *Sanchez*, 812 F.2d at 512 (citing

43

*Ward v. Schweiker*, 686 F.2d 762, 765–66 (9th Cir. 1982)). Second, the Court finds that the new evidence is not material because it does not show "that there is a 'reasonable possibility' that the new evidence would have changed the outcome of the administrative hearing." *Mayes*, 276 F.3d at 462 (quoting *Booz* 734 F.2d at 1380–81). In his report dated December 8, 2016, Dr. Wirth reviewed Rios's MRI from July of 2016 and concluded that Rios "should not return to manual labor" and that Rios "might be a candidate for vocational rehab[ilitation] after" further medical evaluations. Pl.'s Mot at 11. In terms of pain management, Dr. Wirth recommended Rios limit his exertion to "light daily activity" and prescribed ibuprofen and ranitidine. *Id.* Similarly, ALJ Benmour found that Rios could not return to his previous work as a manual laborer and also noted that Rios had been prescribed ibuprofen and hydrocodone for his pain. AR 14, 12. The remaining portion of Dr. Wirth's report in which he indicates Rios may be a suitable candidate for vocational rehabilitation, however, is simply too speculative to show that there is a reasonable possibility it would have changed the outcome of the April 2015 hearing before ALJ Benmour. Accordingly, the Court finds that the new evidence is not material on these grounds.

### 3. Good Cause

Rios also has not shown good cause for failing to submit this new evidence in the prior proceeding. In his Final Argument, Rios contends that ALJ Benmour "has done a lot of wrongdoings" with respect to his case and that, if she and and "SSQ" had "done the right thing" and "sent [him] to a real doctor" that performs x-ray and MRI testing, "[a]ll this wouldn't be an issue now." Pl.'s Final Arg., at 5. In his Opposition to the Commissioner's Motion for Summary Judgment, Rios states that he "was sent to see 2 SSQ doctors" and that the doctors should have conducted x-ray and MRI testing "as they stated they would do in their letters sent to [Rios]." Pl.'s Opp'n., at 7. Rios contends that the doctors' failure to conduct MRI and x-ray testing is why he obtained MRI and x-ray tests from a new physician. *Id.* at 8.

The Ninth Circuit, as well as other district courts within the Ninth Circuit, have declined to find good cause for new evidence in cases similar to the present action. For example, in *Allen*, the Ninth Circuit found that the plaintiff did not show good cause for failing to provide health records for mental health conditions of which he had been aware at the hearing when the sole explanation

the plaintiff provided was that he was not represented by counsel at the administrative hearing. *Allen*, 726 F.2d at 1473. The court reasoned that "[t]he obvious explanation is that when [the plaintiff] was unsuccessful in the agency and district court hearings, he sought out new expert witnesses who might better support his disability claim" and that "[t]he 'good cause' requirement would be meaningless if such circumstances were sufficient to allow introduction of new evidence." *Id.*; *see also Lay v. Astrue*, No. CV-07-1112 (NLS), 2008 WL 2858321, at *15 (S.D. Cal. July 22, 2008) ("The courts cannot remand a case every time a claimant obtains a new medical opinion supporting his case after the ALJ has rendered a decision. The Ninth Circuit has held that this simply does not constitute good cause.").

Additionally, in *De Botello v. Astrue*, the court held that the plaintiff did not show good cause for new evidence obtained from visits to doctors other than those she previously visited before the administrative hearing. No. CV-10-01293 (JAT), 2011 WL 3292401, at *12 (D. Ariz. Aug. 1, 2011). Noting that the plaintiff "was aware of her health problems and was evaluated for them by several doctors," the court found that the plaintiff did not show good cause, reasoning that "[t]he good cause standard would be eviscerated if plaintiffs were permitted to seek more favorable opinions from new physicians after every unfavorable ruling by an ALJ" and that "[t]he obvious explanation for the new medical evidence is that when [the plaintiff] failed to succeed on her disability claim after the hearing, she sought out a new expert witness who might better support her position." *Id.* at *12; *see also Lay*, 2008 WL 2858321 at *6; *Ritzma v. Astrue*, 279 F. App'x 555, 556 (9th Cir. 2008) (denying a pro se plaintiff's request to consider new evidence because he did not explain why he failed to submit the evidence to the ALJ).

Like the plaintiffs in *Allen* and *De Botello*, Rios was aware of his medical conditions prior to the hearing on April 23, 2015. Apart from blaming his prior treating physicians, Rios has not provided an explanation for why he was unable to obtain this evidence prior to the hearing date. The Court finds that most obvious explanation for Rios's decision to seek out a different doctor and obtain additional imaging evidence is because he received an unfavorable decision on July 31, 2015, which the Ninth Circuit has held does not constitute good cause. *See Allen*, 726 F.2d at 1473.

IV.     CONCLUSION

ALJ Benmour erred by failing to adequately develop the record, by providing conclusory statements as opposed to detailed findings as to why she favored Dr. Benrazavi's opinion over that of Dr. Shantharam, and by failing to provide specific, clear, and convincing reasons for discrediting Rios's testimony. ALJ Benmour's decision is reversed. The Court GRANTS Rios's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: February 15, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge